UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 11-22064-CIV-UNGARO

KAPLAN INDUSTRY, INC.,

    Plaintiff,
v.

OAKTREE CAPITAL
MANAGEMENT, L.P.,

    Defendant.
_____/

**DEFENDANT'S MOTION FOR STAY PURSUANT TO SECTION 3 OF THE FEDERAL ARBITRATION ACT, AND PURSUANT TO THE COURT'S DISCRETION IN LIGHT OF EARLIER-FILED AND DIRECTLY-RELATED PENDING ARBITRATIONS, AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to the Federal Arbitration Act (codified at 9 U.S.C. §§ 1-307) (the "FAA"), and the Court's inherent discretionary powers, defendant Oaktree Capital Management, L.P. ("Oaktree") moves this Court for entry of an order staying this action. The alleged claims asserted in this action are referable to arbitration under mandatory written arbitration agreements and, thus, a stay of this action is mandatory under Section 3 of the FAA. 9 U.S.C. § 3. Moreover, even if Section 3 of the FAA did not mandate a stay (which it does), this Court can and should exercise its inherent discretionary powers to stay this action pending the resolution of earlier-filed and directly-related arbitrations involving Plaintiff and Oaktree's alleged subsidiary Gulmar Offshore Middle East, LLC, with whom Plaintiff contracted as alleged throughout the Complaint in this matter. [D.E. 1 at ¶¶ 8-9; Exhibits 1 and 2 to Complaint, filed at D.E. 6].[1]

---

[1] By filing this threshold motion for stay, Oaktree does not waive any motions or defenses under Fed. R. Civ. P 12. Contemporaneous with this motion, Oaktree is filing a motion for enlargement of time [D.E. 11] to file Rule 12 motions until after the disposition of this threshold motion.

## BACKGROUND

### The Parties

Plaintiff Kaplan Industry, Inc. ("Kaplan") is a Panamanian corporation. [D.E. 1 at ¶ 2]. Non-party Gulmar Offshore Middle East, LLC ("Gulmar") is a company organized under the laws of the United Arab Emirates. [D.E. 1 at ¶ 7]. Oaktree is a Delaware limited partnership with its principal place of business in California. [D.E. 1 at ¶ 3]. The Complaint asserts that, on or about August 2010, Oaktree allegedly acquired Gulmar, took managerial control over the board of directors of Gulmar, replaced Gulmar's board of directors and management staff with its own personnel, and took complete control of the operation and management of Gulmar. [D.E. 1 at ¶¶ 8, 24].

### The Subject Consortium Agreement
### Upon Which Kaplan Bases Its Alleged Claims

On or about May 20, 2007, Kaplan and Gulmar entered into a Consortium Agreement (the "Agreement"). [D.E. 1 at ¶¶ 8-9; Exhibit 1 to Complaint, filed at D.E. 6-1]. A copy of the Agreement is Exhibit 1 to the Complaint, and each of Kaplan's alleged claims is purportedly based upon, and makes reference to, the Agreement.[2] The Complaint alleges that the Agreement called for Kaplan and Gulmar to jointly perform services and provide three vessels to perform survey, mapping and repair services in Lake Maracaibo, Venezuela, for Petroleos de Venezuela S.A. ("PDVSA"), a Venezuelan government-owned oil company and agency in Venezuela. [D.E. 1 at ¶ 9; Exhibit 1 to Complaint]. The Agreement refers to the work and services to be performed as the "Project," which Project would be performed pursuant to "BIMCO contracts" to be entered into between Kaplan, Gulmar and PDVSA (which the Agreement refers to collectively as the "Contract"). *See* Agreement at Article 1.4.

---

[2] For the Court's convenience, a copy of the Agreement is also attached hereto as Exhibit A.

### The Applicable Arbitration Agreement
### <u>Contained Within the Consortium Agreement</u>

The Agreement contains a mandatory agreement to arbitrate.  The mandatory arbitration agreement, which is contained in Article 15 of the Agreement, states:

> ***<u>If any dispute should arise in connection with the interpretation and fulfillment of this Agreement</u>***, which is not amicably settled between the Parties within reasonable period, not to exceed 30 days from date of notification of either party to the other, ***<u>same shall be decided by arbitration in the City of London</u>*** and shall be referred to a single arbitrator to be appointed by Kaplan and Gulmar.  If Kaplan and Gulmar cannot agree upon the appointment of a single arbitrator, the dispute shall be settled by three arbitrators, Kaplan and Gulmar appointing one arbitrator, the third being appointed by the London Maritime Arbitrators' Association.  If either of the appointed arbitrators refuses or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.  If one of the Parties fails to appoint an arbitrator – either originally or by way of substitution – for fourteen (14) days after the other party having appointed his arbitrator has sent the party making default written notice to make the appointment, the party appointing the third arbitrator shall, after application from the party having appointed his arbitrator, also appoint an arbitrator on behalf of the party making the default.  The award rendered by the Arbitration Court shall be final and binding upon the Parties and may if necessary be enforced by the Court or any other competent authority in the same manner as a judgment in the Court of Justice.

Agreement at Article 15 (emphasis added).  Thus, ***any*** disputes in connection with the interpretation and fulfillment of the Agreement ***shall*** be decided by arbitration in London.  *Id*.

### Kaplan's Purported Claims Allegedly Arise in Connection
### <u>with the Interpretation and Fulfillment of the Agreement</u>

The alleged claims asserted in the Complaint purportedly arise in connection with the interpretation and fulfillment of the Agreement.  The Complaint refers to and quotes the "Exclusivity" provision in Article 2.5 of the Agreement, and alleges that such provision protected against either party solely competing for the business with PDVSA and Venezuela for the oil support and repair business covered under the Agreement.  [D.E. 1 at ¶ 10; *see* Article 2.5.1 of Agreement].  The Complaint alleges that the "Exclusivity" provision also applies to the

"Affiliates" of each party, which the Agreement defines as, among other things, any entity which controls more than fifty one percent (51%) of the voting share of such party. [D.E. 1 at ¶ 10; *see* Article 2.5.2 of Agreement]. The Complaint also refers to Article 12 of the Agreement, which deals with maintaining confidentiality of certain confidential and proprietary information exchanged between the parties. [D.E. 1 at ¶ 20; *see* Article 12 of Agreement].

The Complaint further alleges that, pursuant to the Agreement, Kaplan and Gulmar entered into three (3) Baltic and International Maritime Council contracts (the "BIMCO contracts") with PDVSA to provide three vessels, divers, technicians, and laborers for a period of five years. [D.E. 1 at ¶ 11]. Copies of the three referenced BIMCO contracts, each of which is dated May 16, 2008, are Exhibit 2 to the Complaint. [D.E. 1 at ¶ 11; copies filed under D.E. 6]. The three BIMCO contracts constituted the "Contract" as defined in the Agreement, which Contract was the subject and purpose of the Agreement. *See* Agreement at Article 1.4. Termination of the Contract would also terminate the Agreement. *See* Agreement at Article 16. Like the Agreement, each BIMCO contract in issue (in Part II, Clause 34 thereof) contains a mandatory agreement to arbitrate, requiring that any disputes arising out of or in connection with the BIMCO contract shall be referred to arbitration in London. [D.E. 6-2 at p.18 of 112; D.E. 6-3 at p.21 of 78; D.E. 6-5 at p.20 of 102].[3]

The Complaint alleges that Kaplan and Gulmar performed under the terms of the Agreement and the BIMCO contracts for approximately fourteen months, until PDVSA defaulted on the BIMCO contracts by failing to pay its contractual debts. [D.E. 1 at ¶ 12]. The

---

[3] In addition to requiring arbitration in London, the Agreement and BIMCO contracts are all governed by ***English*** law. *See* Agreement at Article 15; D.E. 6-2 at p.18 of 112; D.E. 6-3 at p.21 of 78; D.E. 6-5 at p.20 of 102. However, the English choice-of-law provisions do ***not*** render the FAA inapplicable. The FAA continues to apply. *E.g.*, *Olsher Metals Corp. v. Olsher*, No. 01-3212-CIV, 2003 WL 25600635, at **4-5 (S.D. Fla. Mar. 26, 2003) (collecting cases), *aff'd*, No. 03-12184, 2004 WL 5394012 (11th Cir. Jan. 26, 2004).

Complaint further alleges that PDVSA declared the Kaplan-Gulmar consortium a Venezuelan-nationalized entity, went into certain real property leased by Kaplan in Venezuela and declared it the property of the Venezuelan government, and refused to permit the three vessels under the consortium Agreement to leave the port of Maracaibo, Venezuela.  [D.E. 1 at ¶¶ 13, 14]. PDVSA's defaults, breaches, and nationalization culminated in the termination of the BIMCO contracts in May 2009, and the withdrawal of the consortium's three vessels on or about May 22, 2009.  [D.E. 5-3; Exhibit 5 to Complaint].

The Complaint alleges that, before and after the PDVSA's defaults, breaches, and declaration of nationalization, Gulmar attempted to unilaterally negotiate a new arrangement with PDVSA (but not including Kaplan). [D.E. 1 at ¶¶ 12, 17, 18].  The Complaint also alleges that in June 2009, Gulmar allegedly disclosed to PDVSA confidential and propriety pricing information of the consortium.  [D.E. 1 at ¶ 20].  The Complaint asserts that Gulmar's alleged unilateral negotiations with PDVSA violated the Exclusivity provisions in Article 2.5 of the Agreement, and that Gulmar's alleged disclosure of pricing information violated the confidentiality provisions in Article 12 of the Agreement. [D.E. 1 at ¶¶ 19, 20].  The Complaint then asserts that after Oaktree allegedly acquired Gulmar, Oaktree approved the prior actions of Gulmar and sent its agent and acting Gulmar executive to Venezuela to meet with PDVSA officials in another effort to secure exclusive business with PDVSA, which Kaplan alleges was a violation of the Agreement.  [D.E. 1 at ¶ 25].

Kaplan commenced this action on June 8, 2011. [D.E. 1].  Based upon the foregoing allegations regarding the interpretation and fulfillment of the Agreement, the Complaint asserts against Oaktree purported claims for alleged tortious interference with a business relationship (Count I) and alleged conspiracy (Count II).  In Count I, the Complaint alleges that Kaplan had a

business relationship with PDVSA as delineated in the Agreement and related BIMCO contracts. [D.E. 1 at ¶ 27]. The Complaint further alleges that Oaktree, including by and through Gulmar and its employees and agents, interfered with that business relationship by allegedly acting in violation of the exclusivity and confidentiality provisions of the Agreement as described above. [D.E. 1 at ¶¶ 26, 29]. In Count II, the Complaint alleges that Oaktree and Gulmar "combined, joined and conspired" to interfere with a business relationship that Kaplan had with PDVSA (delineated in the Agreement and related BIMCO contracts). [D.E. 1 at ¶¶ 27, 34]. The Complaint further alleges that Oaktree and Gulmar jointly planned and executed alleged "overt acts," which were alleged violations of the exclusivity and confidentiality provisions of the Agreement as described above. [D.E. 1 at ¶¶ 33, 35]. Under both Counts, Kaplan claims it suffered alleged economic damages including the value of the Agreement and related BIMCO contracts. [D.E. 1 at ¶¶ 32, 40].

### The Earlier-Filed and Directly-Related Arbitration Proceedings Pending in London

Prior to Kaplan's commencement of this action, on or about April 28, 2011, Kaplan brought an arbitration proceeding in London against Gulmar. That earlier-filed arbitration proceeding is based upon the same subject matter, Agreement and BIMCO contracts in issue in this action, and includes the same essential allegations made again in this action. Kaplan's disputes with Gulmar were submitted to arbitration in London as required by the mandatory arbitration agreements contained in the Agreement and related BIMCO contracts. A true and correct copy of Kaplan's arbitration statement of claim against Gulmar is attached hereto as Exhibit B. *See* Declaration of Peter W. Homer, attached hereto as Exhibit D.

As even a cursory comparison of Kaplan's arbitration statement of claim and Complaint in this action makes crystal clear, both proceedings involve the very same Agreement, BIMCO

contracts, alleged damages, and essential allegations of alleged wrongdoing. Kaplan's arbitration statement of claim alleges:

> 2. Kaplan and Gulmar entered into a Consortium Agreement (attachment 1). The purpose of the Consortium Agreement was the tender for and performance of work (referred to as the "Project" in para 1.9 the Consortium Agreement) in Lake Maracaibo with PDVSA Petroleo SA ("PDVSA"). The Project primarily concerned the mapping of the area, installation of oil pipelines and the maintenance of pipelines in the area. The tender for the work was successful and the Consortium entered into three charterparties with PDVSA (the "Consortium/PDVSA Charterparties" attachments 2, 3 and 4). In addition to the Consortium/PDVSA charterparties, the Consortium entered into charterparties with Gulmar which identified the sums that Gulmar was entitled to receive from PDVSA (the "Gulmar/Consortium Charterparties" attachments 5, 6 and 7).
> 3. Kaplan have the following claims against Gulmar:
>
> (a) Claims arising during the performance of the charterparties (the "Charterparty Claims");
>
> (b) Claims arising out of Gulmar's breaches of the exclusivity provisions of the Consortium Agreement (the "Exclusivity Claims").

*See* Exhibit B at ¶¶ 2, 3. Kaplan's arbitration statement of claim also quotes the Exclusivity provision in Article 2.5 of the Agreement, and alleges that:

> in breach of clause 2.5 of the Consortium Agreement, Gulmar did not cooperate exclusively with Kaplan throughout the duration of the Agreement, but made secret approaches to PDVSA with a view to securing business for itself and excluding Kaplan, and damaging Kaplan's reputation with PDVSA by suggesting that Kaplan performed no useful function. Further, Gulmar made tenders to PDVSA in the form of offers, again with a view to securing business for itself and excluding Kaplan.

*See* Exhibit B at ¶¶ 12, 16. Also, attached to Kaplan's arbitration statement of claim are copies of the very same Agreement and three BIMCO contracts dated May 16, 2008 that are Exhibits 1 and 2 to Kaplan's Complaint in this action. *See* Exhibit B at attachments 1, 2, 3, 4. Furthermore, as in the Complaint, Kaplan's arbitration statement of claim seeks alleged economic damages including sums allegedly due Kaplan under the Agreement and related BIMCO contracts. *See* Exhibit B at ¶ 18. Thus, it is indisputable that Kaplan's earlier-filed

7

arbitration statement of claim and Complaint in this action are overlapping in every material respect.[4]

In addition to the overlapping arbitration proceeding brought by Kaplan against Gulmar, both Kaplan and Gulmar have brought earlier-filed arbitration proceedings against PDVSA relating to the Agreement and BIMCO contracts. The Complaint alleges that there is "an on-going and existing Arbitration in London, England, to enforce the legal rights of Kaplan, as leader of the Kaplan-Gulmar Offshore consortium, against PDVSA, as per the consortium agreement for breach of the agreement and Charter Parties (the BIMCO contracts)." [D.E. 1 at ¶ 25]. Like Kaplan, Gulmar also brought an earlier-filed arbitration proceeding against PDVSA relating to the Agreement and BIMCO contracts in London, and is seeking to join Kaplan as a co-claimant in the arbitration against PDVSA. *See* Exhibit C, attached hereto; *see* Declaration of Peter W. Homer, attached hereto as Exhibit D. Like the Kaplan-Gulmar arbitration, the arbitration proceedings brought by Kaplan and Gulmar against PDVSA are pending in London and were brought there as required by the mandatory arbitration provisions contained in the Agreement and BIMCO contracts.

## ARGUMENT

The instant action must be stayed under the mandatory terms of Section 3 of the FAA because the alleged claims asserted in this action are referable to arbitration under the written arbitration agreements contained in the Agreement and BIMCO contracts. Even though Oaktree is not a signatory to the Agreement and BIMCO contracts, it *is* entitled to invoke the arbitration

---

[4] By repeating Kaplan's allegations made in the Complaint and in its arbitration statement of claim, Oaktree in no way agrees with them. Among other things, Oaktree denies Kaplan's allegations of alleged misconduct, tortious interference, conspiracy, and other alleged wrongdoing, including any alleged wrongdoing by Gulmar. However, for the sole and only purpose of this motion for stay, Oaktree will treat Kaplan's allegations as true.

provisions against signatory Kaplan as a matter of well-established law and the circumstances of this case. Moreover, even if Section 3 of the FAA did not mandate a stay in favor of arbitration (which it does), this Court can and should exercise its inherent discretionary powers to stay this action pending the resolution of the three earlier-filed, directly-related and substantially overlapping arbitrations by and between Kaplan, Gulmar and PDVSA which raise the same Agreement, BIMCO contracts, and allegations of alleged wrongdoing asserted in this action.

### A. Section 3 Of The Federal Arbitration Act Mandates A Stay Of This Action.

Section 3 of the Federal Arbitration Act ("FAA") provides that a federal court shall stay any litigation upon the application of a party, if the suit was brought "upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Section 3 states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration

9 U.S.C. § 3. Pursuant to the plain language of Section 3, such a stay is mandatory. *E.g., Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (under Section 3 of FAA, court "must" stay proceedings if issue before court is arbitrable).

Here, the issues in this action are referable to arbitration under the mandatory arbitration agreements in the Agreement and in the BIMCO contracts. The Agreement mandates arbitration of any disputes in connection with the interpretation and fulfillment of the Agreement. *See* Agreement at Article 15. As demonstrated above, and as a cursory review of the Complaint and its exhibits confirms, the allegations and alleged claims asserted in the Complaint plainly concern the interpretation and fulfillment of the Agreement, which is Exhibit 1 to the Complaint.

Similarly, the BIMCO contracts mandate arbitration of any disputes in connection with the BIMCO contracts. [*See* D.E. 6-2 at p.18 of 112; D.E. 6-3 at p.21 of 78; D.E. 6-5 at p.20 of 102]. The allegations and alleged claims asserted in the Complaint plainly concern the BIMCO contracts, which are Exhibit 2 to the Complaint. Indeed, the allegations and alleged claims asserted in the Complaint purportedly arise from and revolve around the Agreement and related BIMCO contracts. Moreover, the Complaint in this action overlaps with the allegations and alleged claims asserted by Kaplan against Gulmar in the earlier-filed arbitration proceeding, which are being arbitrated in London as required. *Compare* Complaint *with* Statement of Claim.

Where (as here) the plaintiff's allegations touch matters covered by the arbitration agreement, those claims must be arbitrated irrespective of how the allegations are labeled. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 624 n.13 (1985); *Olsher Metals*, 2003 WL 25600635 at *6, *aff'd*, 2004 WL 5394012. Accordingly, the issues in this action are referable to arbitration under the broad arbitration provisions of the Agreement and/or BIMCO contracts. *E.g., Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F. 3d 753, 758 & n.3 (11th Cir. 1993) (holding that alleged claims for tortious interference and conspiracy (like those asserted here) were arbitrable).

    **B.**  **Oaktree Can Invoke Gulmar's Arbitration Agreements As A Matter Of Law.**

Even though Oaktree is not a signatory to the Agreement and BIMCO contracts, the above result is the same because Oaktree is entitled to invoke the arbitration provisions. The Eleventh Circuit has established various grounds which entitle a non-signatory (Oaktree) to an arbitration agreement to invoke the arbitration agreement against a signatory (Kaplan). *E.g., MS Dealer Serv. Corp. v. Franklin*, 177 F. 3d 942, 947 (11th Cir. 1999); *Sunkist Growers, Inc.*, 10 F. 3d at 756-57; *Garcia v. Mason Contract Products, LLC*, No. 08-23103-CIV, 2010 WL

520805 (S.D. Fla. Feb. 9, 2010). Those grounds (any one of which is sufficient) include equitable estoppel and agency and related principles. *E.g., MS Dealer*, 177 F. 3d at 947.

Pursuant to the theory of agency and related principles, a non-signatory can invoke an arbitration agreement where the relationship between the signatory and non-signatory is sufficiently close. *E.g., MS Dealer*, 177 F. 3d at 947. For example, related entities, such as parent and subsidiary, are entitled to invoke the arbitration clauses of their counterparts in cases like this. *E.g., Olsher Metals*, 2003 WL 25600635 at *8 (collecting cases); *Sunkist*, 10 F. 3d at 757-58 (holding that a parent company is entitled to invoke its subsidiary's arbitration agreement). Here, the Complaint alleges that Oaktree acquired and is the parent of Gulmar. Because of that alleged close parent-subsidiary relationship, Oaktree is entitled to invoke its alleged subsidiary's arbitration agreements. Moreover, the Complaint further alleges that Oaktree is somehow liable for the alleged actions of Gulmar, including those that purportedly occurred even before Oaktree allegedly acquired Gulmar. Thus, because Kaplan maintains that the relationship between Oaktree and Gulmar is sufficiently close such that Oaktree should be held liable for Gulmar's alleged conduct, Oaktree is entitled to invoke the arbitration agreements between Gulmar and Kaplan.

Oaktree can also invoke the arbitration agreements on equitable estoppel grounds. Equitable estoppel applies in two situations: (1) when the claims by a signatory against a non-signatory either make reference to or presume the existence of the written contract; and/or (2) when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and a signatory to the contract. *E.g., MS Dealer*, 177 F. 3d at 947. Although only one situation would suffice, both situations are present here. First, as demonstrated above, Kaplan's alleged claims against Oaktree expressly and specifically

11

reference the Agreement and BIMCO contracts (and incorporate them as Exhibits 1 and 2 to the Complaint), and go well beyond merely presuming the existence of those written agreements. Thus, Oaktree can invoke the arbitration agreements on this basis alone.

Second, as demonstrated above, Kaplan raises allegations of substantially interdependent and concerted misconduct by both Oaktree and Gulmar. Indeed, the Complaint alleges that Oaktree and Gulmar "combined, joined and conspired." [D.E. 1 at ¶ 34]. Moreover, the allegations and alleged claims asserted against Oaktree in this action overlap with those asserted against Gulmar in the arbitration proceeding. Kaplan's allegations and alleged claims against Oaktree "are based on the same facts and are inherently inseparable" from those against Gulmar. *MS Dealer*, 177 F. 3d at 948. Kaplan's alleged claims against Oaktree are sufficiently intertwined with those against Gulmar that Oaktree can invoke the arbitration agreements.

Thus, although Oaktree is not a signatory, it can invoke its alleged subsidiary Gulmar's arbitration agreements with Kaplan and, accordingly, is entitled to a stay under Section 3 of the FAA. *E.g., Bolamos v. Globe Airport Sec. Servs., Inc*., No. 02-21005, 2002 WL 1839210, at **2-3 (S.D. Fla. May 21, 2002) (holding that company had standing to invoke its affiliate's arbitration agreement even though company was not a signatory and granting Section 3 stay). The fact that the arbitration agreements call for arbitration in a foreign country (i.e., London, England) does ***not*** affect the right to a stay under Section 3 of the FAA. *E.g., Mannesmann Rohrleitungsbau G.m.b.H. v. S.S. Bernhard Howaldt*, 254 F. Supp. 278, 279-80 (S.D.N.Y. 1965) (collecting cases). Likewise, the English choice-of-law provisions in the contracts do ***not*** render the FAA inapplicable. *E.g*., *Olsher Metals*, 2003 WL 25600635 at **4-5, *aff'd*, 2004 WL 5394012. Moreover, a Section 3 stay remains mandatory even though the defendant does not

move to compel arbitration under Section 4 of the FAA. *E.g., Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 269 F. Supp. 2d 356, 363-64 (S.D.N.Y. 2003) (collecting cases).

And, even if there was any doubt about the foregoing (which there is not), any such doubt must be resolved in favor of arbitrability and a stay of this action. The FAA evinces an emphatic federal policy favoring arbitration agreements. *E.g.*, *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Any doubts concerning arbitrability should be resolved in favor of arbitration. *Id.* at 24-25. Moreover, this presumption in favor or arbitration "**applies with special force in the field of international commerce**." *Mitsubishi Motors*, 473 U.S. at 631 (emphasis added). Accordingly, this action must be stayed in favor of arbitration pursuant to Section 3 of the FAA.[5]

    **C.**    **The Court Should Exercise Its Inherent Discretionary Powers To Stay This Action Even If Oaktree Cannot Invoke The Arbitration Agreements.**

As shown above, Section 3 of the FAA applies and mandates that this action be stayed. In addition to Section 3's mandated stay, and even if it did not apply (which it does), this Court can and should exercise its inherent discretionary powers to stay this action pending the resolution of the earlier-filed, directly-related and overlapping arbitrations brought by Kaplan against Gulmar, brought by Kaplan against PDVSA, and brought by Gulmar against PDVSA.

The United States Supreme Court has specifically recognized that "it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court…as a matter of its discretion to control its docket." *Moses H. Cone*, 460 U.S. at 20, n.23; *accord Webb v. R. Rowland & Co., Inc.*, 800 F. 2d 803, 808 (8th Cir. 1986) (in addition to Section 3, a district court "also has the inherent power to grant

---

[5] Moreover, there has been no waiver of arbitration by Oaktree, as this motion for stay is Oaktree's first activity in this action.

a stay in order to control its docket, conserve judicial resources, and provide for a just determination of the cases pending before it"). The decision to grant a stay pending arbitration is within the sound discretion of the district court and will not be overturned absent a clear showing of an abuse of that discretion. *Webb*, 800 F. 2d at 808 (affirming stay where district court found that stay of all proceedings pending arbitration was warranted in the interests of the parties and judicial efficiency and to prevent unnecessary litigation).

Here, even if Oaktree could not invoke the arbitration agreements to obtain a Section 3 stay (which it can), a discretionary stay of this action is warranted in light of the three earlier-filed and directly-related arbitrations taking place in London, including, specifically, Kaplan's arbitration proceeding against Gulmar which is squarely overlapping with this action. *E.g., Revelex Corp. v. World Travel Holdings, Inc.*, No. 07-80002-CIV-COHN, 2007 WL 1296457, at *5 (S.D. Fla. May 1, 2007) (holding that even if non-signatory could not invoke signatory's arbitration agreement, "the Court would certainly stay this litigation" because "a suit against a nonsignatory that is based upon the same operative facts and is inherently inseparable from the claims against a signatory should be stayed pending completion of the arbitration"); *Hudson Global Resources Mgmt., Inc. v. Beck*, No. 805CV1446T27TBM, 2006 WL 1722353, at *6 (M.D. Fla. June 20, 2006) (holding that if a non-signatory to an arbitration agreement has no right to enforce arbitration itself, "if its potential liability derives from the conduct or potential liability of a party or signatory, it is entitled to a stay pending arbitration") (citations omitted).

Indeed, there is simply ***no*** good reason not to stay this later-filed, duplicative action. The earlier-filed Kaplan-Gulmar arbitration and this action involve common questions of fact, common allegations and issues (including as to liability and damages), common parties/privies, and the ***very same*** Agreement and three BIMCO contracts. This action is based upon the same

operative facts and contracts and is inherently inseparable from Kaplan's claims against Gulmar that are currently being arbitrated.  Moreover, Kaplan is attempting through this action to impose liability upon Oaktree deriving from the alleged conduct or potential liability of Gulmar.  For these reasons alone, a stay is warranted.  *E.g.*, *Revelex*, *supra*;  *Hudson*, *supra*.  Furthermore, the Agreement and the BIMCO contracts are all governed by **English** law.  *See* Agreement at Article 15;  D.E. 6-2 at p.18 of 112;  D.E. 6-3 at p.21 of 78;  D.E. 6-5 at p.20 of 102.  Thus, the arbitrators in London are better equipped to determine under English law whether, among other issues, there was any violation of the exclusivity or confidentiality provisions of the Agreement, whether the PDVSA's defaults and breaches of the BIMCO contracts terminated the Agreement, and alleged damages issues pertaining to the Agreement and the BIMCO contracts.

Also, if the Kaplan-Gulmar arbitration and this action were to both proceed in parallel fashion, there would be a substantial (if not identical) overlap with respect to the witnesses, documents, evidence, claims, and defenses.  And, given that substantial overlap and the interdependence of the alleged claims asserted against Gulmar and Oaktree, the simultaneous litigation of such claims in separate forums would lead to a duplication of effort, waste of resources, inefficiencies, and the risk of inconsistent decisions, rulings and outcomes (particularly to the extent English law applies).  Thus, a stay is warranted to avoid such duplicative litigation and concomitant waste of resources, and avoid the unnecessary piecemeal resolution of issues that clearly call for a uniform result.  Having the claims heard and decided in one arbitral forum (as opposed to an arbitral forum in London and in this forum in Miami) is plainly preferable, more efficient, would conserve limited resources, and would promote uniform results and judicial economy.  And, for the above reasons, a stay would cause Kaplan *no* hardship or prejudice (undue or otherwise), particularly given Kaplan's status as a signatory to

15

the arbitration agreements and its commencement of the prior Kaplan-Gulmar arbitration. Furthermore, it would be improper for Kaplan to use this Court and its rules of procedure (including discovery tools) as a "stalking horse" or vehicle to seek or obtain discovery that Kaplan may *not* be entitled to in its arbitration against Gulmar. Accordingly, this Court in the exercise of its sound discretion, and as a matter of sound judicial administration, should stay this action until the earlier-filed, directly-related and overlapping arbitrations pending in London are concluded.

## CONCLUSION

As demonstrated above, Oaktree is entitled to a mandatory stay of this action in its entirety pursuant to 9 U.S.C. § 3. The alleged claims asserted against Oaktree are referable to arbitration and *cannot* be litigated in this Court. Even if Oaktree was not entitled to that statutory stay in favor of arbitration (and it is entitled to such stay), a stay of this action pending the completion of the arbitration proceedings between Kaplan and Gulmar, and those between Kaplan, Gulmar and the PDVSA, is warranted pursuant to this Court's inherent discretionary powers.

**Local Rule 7.1 Certificate:** Pursuant to Local Rule 7.1(a)(3), counsel for the movant conferred with plaintiff's counsel Herbert Kim, orally and in writing, in a good faith effort to resolve the issues raised in this motion, but has been unable to resolve the issues.

        Respectfully submitted:

        **HOMERBONNER, P.A.**
        Attorneys for Defendant Oaktree
          Capital Management, L.P.
        1200 Four Seasons Tower
        1441 Brickell Avenue
        Miami, Florida  33131
        Telephone:  (305) 350-5139
        Telecopier:  (305) 372-2738
        Email:  phomer@homerbonner.com
        Email:  gtrask@homerbonner.com

            s/  Peter W. Homer
By: _____
        Peter W. Homer
        Florida Bar No. 291250
        Gregory J. Trask
        Florida Bar No. 0055883

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 1, 2011, I electronically filed the foregoing motion for stay with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF:  Herbert Kim, Esq., Law Office of Herbert Kim, P.A., 1101 Brickell Avenue, Suite 1801, Miami, FL 33131;  and Alexander Kapetanakis, Esq., Alexnander Kapetanakis, P.A., 1101 Brickell Avenue, Suite 1801, Miami, FL 33131.

        <u>/s Peter W. Homer</u>